# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 13, 2004 Session

## STATE OF TENNESSEE v. JEFFERY A. PACK

### Direct Appeal from the Circuit Court for Dickson County
### No. CR-5854     Robert E. Burch, Judge

---

### No. M2003-01431-CCA-R3-CD - Filed February 24, 2004

---

The defendant appeals his conviction for false reporting on the basis of insufficient evidence to support the verdict. After review, we conclude the evidence to be sufficient to support the conviction and affirm the judgment from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

William B. (Jake) Lockert, III, District Public Defender, and C. Wade Bobo, Assistant District Public Defender, for the appellant, Jeffery A. Pack.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Senior Counsel; Dan Mitchum Alsobrooks, District Attorney General; and Kim G. Menke, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Jeffery A. Pack, was charged in a two-count presentment with: (1) making a false report, and (2) assault. A jury convicted the defendant for false reporting and acquitted him of assault. In attacking the sufficiency of the evidence, the defendant claims that the State failed to prove actual knowledge by the defendant of the falsity of his statement to the officers.

### Facts

Patrolman Shane Dunning of the Dickson Police Department was instructed to go to Pete's Trailer Park in Dickson County on August 31, 2001, to find and serve probation violation warrants on Charles Rayburn. At approximately 3:00 p.m., Dunning, accompanied by Deputy Derek Wall of the Dickson County Sheriff's Department, went to trailer 4 in Pete's Trailer Park. Dunning stated

that the officers encountered the defendant and three other males he did not know. Dunning knew from past experience that the defendant and Rayburn were friends and were together regularly.

The defendant was asked if he had seen or heard from Charles Rayburn that day. The defendant responded that he had not seen or heard from Rayburn in a couple of months. The other individuals were questioned by Wall. The officers, having received no information concerning Rayburn, left the immediate area but did not leave the trailer park. The officers were then notified by dispatch that a caller had seen a male, matching Rayburn's description, running from a bush behind trailer 4 and into trailer 5. Trailer 4 and trailer 5 were positioned parallel to each other, with the covered porch on trailer 4 facing trailer 5, which was occupied by the defendant.

The officers immediately returned to the site of trailers 4 and 5. There, both officers questioned the defendant whether he had seen Rayburn. The defendant stated he had not. The defendant told them that trailer 5 belonged to him and, upon request, allowed the officers to enter. Deputy Wall called out for Rayburn, and Rayburn came out of a bedroom in a "soaking wet" condition, wiping himself with a towel. Dunning had previously testified that it was raining on that day. Dunning then arrested the defendant for false reporting and placed him in the backseat of his patrol car with Rayburn. On the way to the police department, the defendant spat on Dunning, resulting in the assault charge.

On cross-examination, Dunning affirmed that on the officers' first visit, he had checked the back door of trailer 5 and found it locked. Afterwards, the defendant maintained to Dunning that he did not know Rayburn was hiding in trailer 5.

On redirect, Dunning stated that the view from the covered porch on trailer 4 toward trailer 5 was unobstructed and that any person crossing from trailer 4 to trailer 5 would be visible from the porch on trailer 4. Dunning also testified that when the officers returned on their second visit, the defendant was coming off the porch of trailer 5. When questioned then, the defendant again denied any knowledge about Rayburn's location.

Dickson County Sheriff's Deputy Derek Wall next testified concerning the events at Pete's Trailer Park. Wall knew both the defendant and Charles Rayburn and had often seen them together. He stated that on the officers' initial arrival at trailer 4, he saw the defendant, William Cathey, Jr., and Danny Hedge, and that he believed there was another person present. In response to the officers' queries concerning Rayburn, the defendant and the others said they had not seen him or he was not there at that time. The two officers walked around the trailers to see if Rayburn was hiding in the bushes or close to the trailer. After leaving the site, the officers received a dispatch report that "Rayburn had just run into Trailer 5." They returned immediately and went to trailer 5. The defendant came from trailer 4, according to Wall, and announced that trailer 5 was his. Wall asked the defendant to come over to trailer 5. The defendant allowed the officers entry and was asked if he had seen Rayburn enter trailer 5. The defendant stated, "I haven't seen him. If he is in here, I don't know."

Upon entry, Wall noticed evidence of remodeling inside trailer 5. He called out for Rayburn, who emerged from a bedroom, soaking wet and wiping himself with a towel. Deputy Wall stated that anyone going from trailer 4 to trailer 5 would be visible from the porch of trailer 4. On cross-examination, he estimated the distance from the porch of trailer 4 to trailer 5 as 20 to 25 yards. Wall said the defendant was the only person he questioned on the officers' second visit.

Danny Joe Hedge, a defense witness, stated that he lived at trailer 4 in Pete's Trailer Park with his mother and step-father, William Cathey. Charles Rayburn lived there on an irregular basis. The defendant was residing there while his trailer, number 5, was under repairs. Rayburn had spent the night of August 30-31, 2002, at trailer 4.

According to Hedge, Rayburn left the trailer at 6:30 a.m. He also stated that the defendant arrived at 7:00 a.m. and that Hedge and the defendant went to Kingston Springs to perform roofing work until noon. Upon their return to the trailer, they left to investigate buying some truck tires. The group included Hedge, William Cathey, Dan Revere, and the defendant. When the group came back to trailer 4, the officers arrived simultaneously. He stated that the officers talked to each individual present and asked about Charles Rayburn. Mr. Cathey invited them to search inside trailer 4, but the officers declined. The defendant, who had gone inside trailer 4 to prepare a sandwich and tea, remained there until the officers returned on their second visit. Cathey stated he remained outside on the porch of trailer 4 during the time when the officers left the scene. At no time did Hedge see Rayburn enter trailer 5.

On the officers' return, the defendant gave them permission to enter trailer 5. After finding Rayburn, the officers arrested the defendant for "harboring a fugitive."

During cross-examination, Hedge estimated the distance between trailers 4 and 5 as approximately 15 yards. He denied knowing how Rayburn got into trailer 5 other than "he went in there without permission, because nobody knew that he was even there."

William Cathey, Jr., testified that he lived in trailer 4. He said the defendant had also been living there for three or four months while repairing trailer 5. In reference to Rayburn, Cathey testified as follows: "[a]s soon as [Rayburn] gets out of jail, he comes straight to my house. And that's where are his clothes and that's where he lives. At my house."

Cathey stated Rayburn had been brought to his trailer at 9:00 or 10:00 a.m. on the morning of August 31, 2001, to get some clothing and then left. Cathey's testimony was contradictory as to whether the defendant was present at that time. One sequence of testimony was as follows:

[Defense Counsel]:  . . . Do you remember about what time it was that [Rayburn] was over there that particular morning?
[Cathey]:  No, sir.
[Defense Counsel]:  Do you know if the defendant was there when he came over that morning?
[Cathey]:  No, sir.

| [Defense Counsel]: | You don't know or . . . |
| [Cathey]: | Are you talking about Jeff? |
| [Defense Counsel]: | Yeah -- |
| [Cathey]: | Yeah. |
| [Defense Counsel]: | -- Mr. Pack. |
| [Cathey]: | Yeah, he was there all day. |

On cross-examination by the assistant district attorney, Cathey testified in the following manner:

| [Assistant District Attorney]: | . . . -- Let's start in the morning. It's six-thirty (6:30), where is Charles Rayburn? |
| [Cathey]: | I don't know where he was at at six o'clock (6:00) in the morning. He didn't get over there to the house until, probably -- It was around nine or ten o'clock (9:00 or 10:00). Susie brought him by there and, then, she needed him with her, and he got back in the car with her and left. |
| [Assistant District Attorney]: | All right, so you were there at nine o'clock (9:00) when he got there? |
| [Cathey]: | Yes. |
| [Assistant District Attorney]: | All right. And Jeff Pack was there at nine o'clock (9:00) when he got there? |
| [Cathey]: | I don't know if he was there or not. |
| [Assistant District Attorney]: | Well, you just said a while back that Jeff was there all day? Now, is he not there all day, now? |
| [Cathey]: | Well, he wasn't around me all day. |

Mr. Cathey testified that he, the defendant, Danny Joe Hedge, and an individual named Delmar had spent part of the day at Hardy Osborne's looking at tires for a truck. The group arrived back at Cathey's trailer at approximately the same time as the officers' initial arrival. Cathey denied any personal conversation with the officers and stated he was inside trailer 4 during the officers' first visit. He claimed that he saw the officers go into trailer 5 on two separate occasions. On the officers' second visit, Cathey stated the defendant was in trailer 4, preparing a glass of tea, until the defendant was called outside by the officers.

Mr. Cathey testified that while he was in a group of five or six people on the porch of trailer 4, he saw a woman in an adjoining trailer on the telephone, laughing, and looking out the window. He surmised that she had reported seeing Rayburn run into trailer 5 and was making a police report because the two officers immediately returned to the scene. The witness admitted that Rayburn would be visible in crossing from the bush by trailer 4 to the back door of trailer 5. However, he denied seeing Rayburn because he was talking to the others on the porch. Mr. Cathey's version of

events on August 31, 2001, was in apparent conflict with Danny Joe Hedge's testimony that Hedge and the defendant had gone to Kingston Springs on a roofing job that day.

The defendant elected not to testify, and the defense concluded its proof.

**Analysis**

In determining sufficiency, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Our standard of review is, after reviewing the evidence in a light most favorable to the prosecution, to determine whether any rational trier of fact could have found the essential elements of the criminal offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This Court may not substitute its own inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). A guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A guilty verdict removes the presumption of innocence and raises a presumption of guilt, thus casting the burden of overcoming this presumption on the defendant. Id.

The defendant was charged with violation of Tennessee Code Annotated section 39-16-502(a)(2), which provides as follows:

(a) It is unlawful for any person to:

   (2) Make a report or statement in response to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident within the officer's concern, knowing that such report or statement is false and with the intent to obstruct or hinder the officer from:

   (A) Preventing the offense or incident from occurring or continuing to occur; or

   (B) Apprehending or locating another person suspected of committing an offense.

The evidence, in the light most favorable to the State, established that the officers were seeking to apprehend Charles Rayburn on charges of probation violation. The defendant's witnesses stated that both Rayburn and the defendant were living, at least part-time, at William Cathey's trailer, identified as number 4. Rayburn had been at Cathey's trailer on the morning of August 31, 2001, and by one account of Cathey, the defendant was also there. By Hedge's account, Rayburn had spent the night there. On their first visit, the officers asked the defendant if he had seen or heard from Rayburn on that date. The defendant responded that he had not seen or heard from Rayburn in a couple of months. The officers left the immediate area but, after receiving a report that Rayburn had just entered the defendant's trailer, the officers returned. Deputy Wall told the defendant of the report they had received, and the defendant stated that he had not seen Rayburn and that if he was in the defendant's trailer, he did not know it. This was immediately prior to the discovery of Rayburn hiding in the defendant's trailer. Rayburn was still very wet, indicating his recent entry.

There was uncontradicted evidence that the defendant and the fugitive, Rayburn, were close associates and were, on that date, living at trailer 4 with William Cathey. There was testimony that both Rayburn and the defendant were both at Cathey's trailer the morning of the defendant's arrest. There was also evidence from which a rational jury could infer that the defendant knew Rayburn was hiding in the defendant's trailer. It is undisputed that the defendant disavowed any knowledge of Rayburn's whereabouts in response to the officers' inquiries.

The jury was eminently entitled to accept the State's evidence that the defendant's responsive statements to the officers' inquiries were knowingly false and were intended to hinder the apprehension of the fugitive, Rayburn. The evidence amply supports this finding, and we affirm the conviction.

_____
JOHN EVERETT WILLIAMS, JUDGE